**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND AND DANIEL WILLIAMS | * | |
| Plaintiffs, | * | |
| v. | * | Civil No. 25-02624-BAH |
| ALLEGION ACCESS TECHNOLOGIES, LLC., | * | |
| Defendant/Third-Party Plaintiff, | * | |
| v. | * | |
| GLAZIERS AND STRUCTURAL GLASS WORKERS LOCAL UNION 1333, DISTRICT COUNCIL 11 | * | |
| Third-Party Defendant | * | |

* * * * * * * * * * * * * *

**MEMORANDUM OPINION**

Plaintiffs International Painters and Allied Trades Industry Pension Fund ("the Fund") and Daniel Williams (collectively, "Plaintiffs") brought suit against Allegion Access Technologies, LLC ("Allegion") on August 8, 2025, alleging failure to comply with the Employee Retirement Income Security Act of 1974 ("ERISA") as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). ECF 1. Allegion then filed a third-party complaint against Glaziers and Structural Glass Workers Local Union 1333, District Council 11 ("the Union") pursuant to Federal Rules of Civil Procedure 14 and 19. ECF 17. Pending before the Court is the Union's motion to dismiss Allegion's third-party complaint. ECF 25. Allegion filed an

opposition, ECF 36, and the Union filed a reply, ECF 38. All filings include memoranda of law.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, the Union's motion to dismiss the third-party complaint is **GRANTED.**

## I. BACKGROUND

### A. Factual Background[2]

#### 1. Origins of the Relationship

On July 31, 2021, Stanley Black & Decker ("Stanley") and the Union executed a collective bargaining agreement ("CBA"). ECF 17, at 2 ¶ 7. On July 5, 2022, Allegion acquired Stanley Access Technologies, LLC ("Access Technologies") from Stanley and stepped into the shoes of Stanley and Access Technologies on the CBA and on over fifteen other collective bargaining agreements. *Id.* at 2–3 ¶¶ 8–9. When Allegion stepped into the shoes of Stanley and Access Technologies, the parties agreed to move the Union's bargaining unit employees to Allegion's benefit plans. *Id.* at 3 ¶ 14. At least eight of the collective bargaining agreements Allegion assumed responsibility for maintaining required pension benefit contributions to the Fund on behalf of bargaining unit employees. *Id.* at 2 ¶ 9.

#### 2. The CBA

The CBA was effective from February 1, 2021, through January 31, 2024. *Id.* at 3 ¶ 10. Section 18.1 of the CBA provides that the CBA automatically extends each year unless the

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[2] The facts provided in this section are taken from Allegion's third-party complaint and are assumed true for the purposes of the pending motion to dismiss. *See Kan. City Live Block 124 Retail, LLC v. Kobe Kan., LLC*, Civ. No. GLR-14-3236, 2015 WL 6151266, at *1 n.1 (D. Md. Oct. 16, 2015) (citing *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).

employer or the Union provides "written notice to the other at least sixty (60) days prior to the expiration date or any yearly anniversary thereafter that they desire to modify or terminate the Agreement." *Id.* ¶ 11. Section 9.1 of the CBA requires disputes between the parties to be submitted to a grievance and arbitration procedure and prohibits strikes and lockouts. *Id.* ¶ 13. Section 2.7 of the CBA includes a checkoff authorization form (the "Authorization Form") that all bargaining unit employees were required to execute. *Id.* at 4 ¶¶ 18–19. The form authorizes paycheck deductions to be paid to the Union, effective February 1, 2021, and states that the authorization is "irrevocable for the term of one year and shall automatically renew itself for successive yearly periods thereafter, until [the employee] give[s] written notice to the Company and the Union at least sixty (60) days . . . before any periodic renewal date of this authorization and assignment of [the employee's] desire to revoke the same." *Id.* at 4–5 ¶ 19.

3. Deauthorizing the Union and the Union's Disclaimer of Representation

At some point prior to February 22, 2023, a bargaining unit employee filed a petition (the "Petition") with the National Labor Relations Board ("NLRB"), Case No. 01-US-309536, seeking to withdraw the Union's authority to require bargaining unit employees to make payments to the Union pursuant to the CBA. *Id.* at 4 ¶¶ 15–16. The bargaining unit voted in favor of the Petition and the NLRB certified the election results on February 22, 2023. *Id.* ¶ 17. Following the deauthorization vote, Allegion reached out to the Union to discuss the Authorization Form and its impact on bargaining unit employees. *Id.* ¶ 18. The Union confirmed that the Authorization Form signed by the bargaining unit employees could not be immediately revoked. *Id.* ¶ 19.

However, on February 28, 2023, before any bargaining unit employees had revoked their Authorization Forms under § 2.7 of the CBA, the Union advised the bargaining unit that it "disclaim[ed] all interest in representing the twenty-one (21) member collective bargaining unit."

*Id.* at 5–6, ¶ 23 (brackets in original). The Union provided no advanced notice to Allegion of its disclaimer of interest, *id.* at 6 ¶ 24, and claimed that it had the right to ignore the CBA provisions upon disclaiming interest in the Union, *id.* ¶ 26.

The Union's disclaimer also stopped Allegion's ability to make contributions to the Fund on behalf of the bargaining unit employees. *Id.* ¶ 25. On March 14, 2023, Allegion sent a letter to the Union in response to its disclaimer of interest informing the Union that the disclaimer was unlawful, that it may result in Allegion's withdrawal liability, and that Allegion would file a lawsuit if such liability resulted. *Id.* ¶¶ 26–27. In response, on April 6, 2023, the Union reversed course, seeking to retract its disclaimer and reclaim interest in the bargaining unit as confirmed through an April 13, 2023, letter to Allegion. *Id.* ¶ 28. Allegion responded in letters dated April 11, 2023, and May 15, 2023, explaining that the Union's material breach of the CBA resulted in the CBA's termination and that the Union "could not simply seek to resume its obligations thereunder." *Id.* at 7 ¶ 29. Then, on November 9, 2023, the Union submitted to Allegion its notice of intent to terminate the CBA at the conclusion of the term, to which Allegion responded on November 15, 2023, by reiterating its position that the Union had already terminated the CBA by materially breaching the agreement in February 2023. *Id.* ¶¶ 30–31.

4. <u>Allegion's Plan Contribution Obligations and Governing Standards</u>

Paragraph 14.6 of the CBA requires Allegion to make payments to the Fund's pension plan for all hours worked by the bargaining unit. *Id.* at 7 ¶ 32. Article 11 of the International and Allied Trades Industry Pension Plan agreement (the "Plan") addresses employer withdrawals from the Plan and verifies that the Section 11's rules "generally" apply to construction industry employers, whereas withdrawals by non-construction industry employers are governed by ERISA provisions 4203, 4205, 4208, and 4219, rather than Article 11. *Id.* ¶¶ 33–34. Allegion is the control group

employer under Section 11.02(a) of the Plan. *Id.* at 8 ¶ 37. Under Section 11.03 of the Plan, a control group employer is in the construction industry "if substantially all the Employees with respect to whom the Control Group Employer has an obligation to contribute under the Plan perform work in the building and construction industry." *Id.*

While the Fund historically considered Stanley, a tool manufacturer, to be a non-construction industry employer, Allegion's sole focus as a company is on state-of-the-art slide doors for industrial, commercial, healthcare, and retail use. *Id.* ¶¶ 38–39. Allegion employs 180 employees involved in the manufacturing of the sliding doors and 545 technicians who install the sliding doors. *Id.* ¶ 40. The bargaining unit in question consists of technicians who install, repair, and maintain the sliding doors. *Id.* Because 75 percent of Allegion's employees work in the building and construction industry as technicians, Allegion is a construction industry employer and is governed by Section 11's rules regarding employer withdrawals from the Plan. *Id.* at 9 ¶ 42.

5. <u>Allegion's Alleged Withdrawal Liability and Response</u>

On March 10, 2025, the Fund sent a letter to Allegion assessing estimated partial withdrawal liability of $1,917,8967 for the year 2023, the same year that the Union allegedly terminated the CBA and Allegion stopped making payments into the Fund. *Id.* ¶ 45, at 10 ¶ 51. The Fund based its assessment of Allegion's partial withdrawal from the Fund on Section 4205(a)(2) of ERISA, 29 U.S.C. § 1385(a)(2), and alternatively, Section 4208(d)(1) of ERISA, 29 U.S.C. § 1388(d)(1). *Id.* at 9–10 ¶ 47. However, Allegion contends that ERISA was an inappropriate basis for assessment, as Section 11.05 of the Plan addresses partial withdrawals from construction industry employers and provides that a partial withdrawal for construction industry employers occurs "only if, on the last day of a Plan Year, the Control Group Employer's work

mix, within the craft and area jurisdiction of a Collective Bargaining Agreement under which it is obligated to contribute to the Plan, shifts, with the result that no more than an insubstantial portion of such work remains covered under the Plan." *Id.* at 10 ¶ 48.

Prior to the Union's disclaimer of interest, Allegion was a signatory to eight collective bargaining agreements with the International Union of Painters & Allied Trades, AFL-CIO, with 20 of the 77 total employees covered by those agreements represented by the Union. *Id.* ¶ 50. The total hours worked by employees contributing into the Plan in 2023 was 81,594.15 hours, totaling $409,336.45 in contributions. *Id.* ¶ 51. However, when the Union disclaimed the bargaining unit in February 2023, Allegion ceased making contributions into the Plan on behalf of those employees. *Id.* ¶ 51. Allegion's contributions for the five years before 2023 were: $126,514.15 in 2018; $169,489.54 in 2019; $157,235.70 in 2020; $153,467.24 in 2021; and $139,176.55 in 2022. *Id.* at 10–11 ¶ 52.

In response to the Fund's letter providing notice of partial withdrawal liability, Allegion submitted a request for review on June 5, 2025, challenging the determination on the basis that the Fund improperly assessed Allegion as a non-construction industry employer and discounted the Union's breach of the CBA. *Id.* at 11 ¶ 53. The Fund denied the request for review in its entirety. *Id.* ¶ 57.

**B. Procedural History**

The Fund filed suit against Allegion on August 8, 2025, seeking to compel compliance with the MPPAA's "pay now, dispute later" provision as the Fund's withdrawal liability assessment proceeded through dispute-resolution and arbitration channels. ECF 1. Defendant

Allegion answered on October 7, 2025, and filed a counterclaim against Plaintiffs.[3] ECF 16. The same day, Allegion also filed a third-party complaint against the Union, bringing three counts for breach of contract, attorney's fees and indemnification, and unjust enrichment. ECF 17. On December 5, 2025, the Union filed a motion to dismiss the third-party complaint for failure to state a claim on all counts. ECF 25. Allegion responded in opposition to the Union's motion to dismiss on January 9, 2026, ECF 36, to which the Union replied on January 23, 2026, ECF 38. Separately, Plaintiff and Defendant have cross-filed motions for summary judgment, which will be addressed in a separate memorandum and order from the Court.[4] Currently, the Union's motion to dismiss is pending before the Court.

## II. LEGAL STANDARD

As explained below, though the Union only formally moves for dismissal under Fed. R. Civ. Pro. 12(b)(6), it also disputes the Court's subject matter jurisdiction, as governed by Fed. R. Civ. Pro. 12(b)(1). Consequently, the Court lays out the standards for both rules.

### A. Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a complaint for a lack of subject matter jurisdiction. "Motions to dismiss for lack of subject matter jurisdiction are properly granted where a claim fails to allege facts upon which the court may base jurisdiction." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005) (citing *Crosten v. Kamauf*, 932 F.

---

[3] The Court approved the dismissal of Allegion's counterclaim without prejudice by stipulation on January 7, 2026. ECF 35.

[4] *See* ECF 39 (Plaintiff's motion for summary judgment); ECF 42 (Defendant's cross motion for summary judgment and response in opposition to Plaintiff's motion for summary judgment); ECF 45 (Plaintiff's reply to Defendant's response to motion for summary judgment and response in opposition to Defendant's cross motion for summary judgment); ECF 46 (Defendant's reply to Plaintiff's response in opposition to Defendant's cross motion for summary judgment).

Supp. 676, 679 (D. Md. 1996)). "A challenge to jurisdiction under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" *Int'l Painters & Allied Trades Indus. Pension Fund v. Union Group, Ltd.*, Civ No. RDB-23-3239, 2025 WL 694587, at *4 (D. Md. Mar. 4, 2025) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). Federal courts are courts of limited jurisdiction, and the plaintiff bears the burden of demonstrating that this Court has the authority to hear the case. *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014). Moreover, "questions of subject-matter jurisdiction may be raised at any point during the proceedings and may (or, more precisely, must) be raised sua sponte by the court." *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004). In deciding whether a complaint alleges facts sufficient to support subject matter jurisdiction, the Court assumes the truthfulness of the facts alleged. *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009).

**B. Failure to State a Claim**

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount any legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

"In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." *EI du Pont de Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (citing *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (ellipses in original and internal quotations omitted) (quoting *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)). "Accordingly, if a breach-of-contract plaintiff alleges a failure to perform an act required by the contract, the contract's description of the defendant's duties will prevail over the plaintiff's contrary characterization." *Goines*, 822 F.3d at 166.

## III. <u>ANALYSIS</u>

Allegion brings three counts against the Union for breach of contract (Count I), attorney fees and indemnification (Count II), and unjust enrichment (Count III). ECF 17, at 12–14 ¶¶ 64–85. The Court addresses each count in turn.

**A. Breach of Contract**

Allegion argues that the Union breached the CBA by prematurely disclaiming interest in the bargaining unit on February 28, 2023. ECF 17, at 5–6 ¶ 23. The Union raises two arguments for dismissal of this claim. First, the Union argues that the claim is preempted by Allegion's failure to exhaust administrative remedies as required by the National Labor Relations Act (NLRA) and that the Court thus lacks jurisdiction because the dispute is a primarily representational matter. ECF 25-1, at 6–9. Second, even if the claim is not preempted, the Union argues that Allegion has not pled sufficient facts to establish a breach of contract. *Id.* at 9. In response, Allegion objects to the Union's use of what it characterizes as an affirmative defense of preemption at the motion to dismiss stage, ECF 36, at 19–23, and reiterates that it has pled sufficient facts to support its breach of contract claim, ECF 36, at 15–17.

1. Jurisdiction

Though styled as a preemption claim in both Allegion's and the Union's briefs, *see* ECF 25-1, at 6, ECF 36, at 19, ECF 38, at 15, the Union effectively raises a 12(b)(1) issue of the Court's subject matter jurisdiction. The Union argues that Allegion "makes no allegations from which it can be concluded that the alleged breach is anything other than an issue of an early termination of representation of the bargaining unit," resulting in exclusive NLRB jurisdiction and defeating the Court's subject matter jurisdiction. ECF 25-1, at 7; *see also Union Group, Ltd*, 2025 WL 694587, at *4 (considering 12(b)(1) motion where defendant contended "that interpretation of the parties' Bargaining Agreement depends entirely on whom the union represents such that this court lacks subject matter jurisdiction"). Allegion responds that the Union has raised an affirmative defense of preemption that is inappropriate at the motion to dismiss stage, and that even if the Court may

consider the Union's preemption argument, the Court has jurisdiction under § 301 of the NLRA. ECF 36, at 19–23.[5]

"Generally, the National Labor Relations Board is vested with jurisdiction over the area of labor management relations." *Amalgamated Clothing & Textile Workers Union, AFL-CIO v. Facetglas, Inc.*, 845 F.2d 1250, 1251 (4th Cir. 1988). "In addition to handling unfair labor practice complaints, the Board is responsible for resolving representational issues, including identification of an appropriate collective-bargaining unit and certification of an exclusive bargaining agent." *Id.* at 1251–52 (internal citations omitted). However, district courts also have "limited jurisdiction pursuant to section 301 of the Labor Management Relations Act [("LMRA").]" *Id.* at 1252. "The jurisdictions of the Board and the court are not mutually exclusive and claims may arise within both jurisdictions." *Id.* "For example, where an activity is arguably both an unfair labor practice and a breach of a collective-bargaining contract, the Board's authority 'is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301.'" *Id.* (quoting *William E. Arnold Co. v. Carpenters Dist. Council*, 417 U.S. 12, 16 (1974)). Even still, the Fourth Circuit "has held that jurisdiction under section 301 is precluded if the contractual dispute is 'primarily representational.'" *Id.* (quoting *United Bhd. of Carpenters, Loc. Union No. 1694 v. W.T. Galliher & Bros.*, 787 F.2d 953, 954 (4th Cir. 1986)). While the Fourth Circuit does not appear to have defined what makes a matter primarily representational, Judge Bennett observed in *Union Group,*

[5] Allegion notes that affirmative defenses are typically improper for the Court to consider on a motion to dismiss. ECF 36, at 19; *see also Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993) (noting a 12(b)(6) motion is "intended to test the legal adequacy of the complaint, and not to address the merits of any affirmative defenses" apart from "limited circumstances where the allegations of the complaint give rise to an affirmative defense"). Because the Union raises a question of the Court's jurisdiction (while framing it as a preemption issue), however, the Court considers it under Fed. R. Civ. Pro. 12(b)(1) without deciding whether the complaint includes facts on its face that give rise to consideration of affirmative defenses.

*Ltd.* that cases "raising 'primarily representational' issues typically involve union arbitration disputes or a labor union suing under the LMRA 'to enforce its own collective bargaining agreements and either force an employer to deal with the union or to refrain from using a second corporation to hire non-union labor.'" 2025 WL 694587 at *11 (quoting *Laborers' Dist. Council Health & Welfare Tr. Fund No. 2 v. Comet Contracting, LLC*, Civ. No. RWT 03–2196, 2006 WL 2085847, at *7 (D. Md. July 25, 2006)).

In arguing that Allegion has pled a primarily representational matter, the Union cites one Second Circuit case and several Ninth Circuit cases, but omits from its response any discussion of what a representational matter is or why the present dispute is primarily representational in nature. *See* ECF 25-1, at 6–9. For example, the Union cites *Am. Fed'n of Musicians & Employers' Pension Fund v. Neshoma Orchestra & Singers, Inc.*, where the Second Circuit held that the district court lacked subject matter jurisdiction over a third-party complaint against a union that "grew out of an allegedly bad-faith promise made during collective bargaining." 974 F.3d 117, 123–24 (2d. Cir. 2020). But as the Second Circuit noted, and as quoted in the Union's motion to dismiss, ECF 25-1, at 7, the district court lacked jurisdiction *because* the union was alleged to have bargained in bad faith in violation of 29 U.S.C. § 158(b)(3) and § 158(d). *Id.* The Union offers no authority to support the proposition that the Union's disclaimer of the bargaining unit here is analogous to this bad faith bargaining such that the Court lacks subject matter jurisdiction. The Union also cites *United Ass'n of Journeymen v. Valley Engineers*, ECF 25-1, at 7, which clarified the NLRB's primary jurisdiction with respect to a union's "alter ego and single employer claims." 975 F.2d 611, 614 (9th Cir. 1992). Of course, the case at bar does not present these issues. The Union also references an order to show cause in *Garcia v. Bradshaw,* which the Union asserts supports a district court's jurisdiction over an employer's claim that a union unlawfully disclaimed

its bargaining unit. ECF 25-1, at 8 (citing No. 24-cv-03068-JSC, 2024 WL 4528718, at *2 (N.D. Cal. Oct. 18, 2024)). However, as the quote cited by the Union reflects, the *Garcia* court chose *not* to address whether it had jurisdiction at all, particularly *because* "that very same issue [was] pending before the NLRB." *Id.* Finally, the Union highlights *Chef Solutions, Inc. v. Prod. & Maint. Union, Loc. 101*, No. 05 C 6146, 2006 WL 1722372, at *2–3 (N.D. Ill. June 19, 2006) for the proposition that a union's disclaimer of a bargaining unit is a representational issue that must be decided by the NLRB. However, as in *Garcia*, the *Chef Solutions* court did not ultimately decide the jurisdictional question, instead holding that because the NLRB found the union's disclaimer to be valid, the agreement that the plaintiff company sought to enforce was void, and "a suit to enforce such a contract may not be sustained." *Id.* at *3. The Union thus leaves the Court with little from which to conclude that it has no jurisdiction over Allegion's claim.

On the other hand, Allegion points to *Toyota Landscape Co., Inc. v. Bldg. Material & Dump Truck Drivers Loc. 420*, noting that the Ninth Circuit confirmed the district court's jurisdiction over the plaintiff's breach of contract claim pursuant to § 301 of the NLRA for the union's alleged violation of a no-strike provision and its disclaimer of its bargaining unit. 726 F.2d 525, 527–29 (9th Cir. 1984). The Union, in contrast, reads *Toyota Landscape* as finding concurrent jurisdiction with the NLRB "on the grounds that the representational issues regarding the disclaimer of interest were within the jurisdiction of the NLRB, but that the breach of the contractual no-strike clause was within the jurisdiction of the Federal Court." ECF 25-1, at 8. However, the *Toyota Landscape* court appeared to read the disclaimer dispute as a breach of contract question, not a primarily representational one, noting that the union had "effectively repudiated the collective bargaining agreement by disclaiming interest in representing all the

employees covered" and holding "as a matter of law that [the union's] disclaimer violated the collective bargaining agreement." 726 F.2d at 528–29.

The dueling interpretations of *Toyota Landscape*'s parsing of which adjudicative bodies have jurisdiction over particular claims stems from the fact that the complaint there included "both unfair labor practice charges and breach of collective bargaining agreement claims." 726 F.2d at 527. The Union frames the opinion as finding concurrent jurisdiction *only* because the plaintiff alleged a breach of the no-strike provision in the collective bargaining agreement, pointing to the court's note in *Toyota Landscape* that "[i]n the instant case, breach of contract, specifically of the no strike provision . . . has been alleged *as required* by *Painting & Decorating Contractors Assoc. v. Painters & Decorators Joint Comm.*, 707 F.2d 1067, 1070–71 (9th Cir. 1983)." *Id.* at 528. (emphasis added). *Painting & Decorating*, however, did not involve a disclaimer issue, and merely notes that "[t]o assert jurisdiction under § 301(a), a litigant must allege a breach of a contract between an employer and a labor organization . . . in an industry affecting commerce." 707 F.2d at 1070. *Painting & Decorating* appears, then, to simply require allegation of a breach of contract to assert § 301 jurisdiction and does not resolve whether disclaimer of a collective bargaining agreements constitutes such a claim.

The *Toyota Landscape* court is not explicit as to whether it considers the disclaimer issue to be an unfair labor practice charge or a breach of contract claim. However, because the court ultimately held that it has jurisdiction over "the breach of collective bargaining agreement *claims*," it appears to consider both the no-strike provision violation *and* the disclaimer claims to be breach of contract claims separate from the unfair labor charges that fell within the NLRB's primary jurisdiction. 726 F.2d at 528 (emphasis added). Subsequent opinions have interpreted *Toyota Landscape* similarly. *See Maclellan Indus. Servs. v. Loc. Union No. 1176*, No. C06-04021 MJJ,

2006 WL 2884410, at *9 (N.D. Cal. Oct. 10, 2006) (characterizing *Toyota Landscape* as "finding union's disclaimer violated the collective bargaining agreement as a matter of law"); *see also AIC Sec. Investigations, Ltd. v. Gen. Serv. Emps. Union, Loc. No. 73*, No. 88 C 8898, 1990 WL 156496, at *3 (N.D. Ill. Oct. 10, 1990) (same).

No party cites, and the Court has not identified, binding Fourth Circuit authority clarifying whether the Union's disclaimer should be considered a primarily representational issue in the NLRB's exclusive jurisdiction or a breach of contract claim over which the Court has § 301 jurisdiction. Nor does the disclaimer issue clearly fall into what cases from this district have recognized as typical representational issues. *See Union Group, Ltd.*, 2025 WL 694587, at *11 (identifying primarily representational cases as typically involving union arbitration disputes or labor unions suing under the LMRA to enforce their collective bargaining agreements). Given that *Toyota Landscape*, the core case in dispute between the parties, appears to support § 301 jurisdiction for a breach of contract claim involving a union's allegedly invalid disclaimer of interest in its bargaining unit, the Court finds that it has jurisdiction over Allegion's claim. However, because the Court's subject matter jurisdiction may be challenged at any time, *Brickwood Contractors*, 369 F.3d at 390, the Union is free to raise this argument with additional authority in the future as necessary.

2. <u>Whether Allegion Has Adequately Pled Breach of Contract</u>

The Supreme Court has recognized a federal common-law claim for breach of a CBA under § 301 of the LMRA, as codified at 29 U.S.C. § 141 et seq. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 295 n.2 (2010) (citing *Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957)). "Section 301 of the LMRA provides that suits for violation of collective-bargaining agreements may be filed in federal court." *Davis v. Bell Atlantic-West Virginia*, 110

F.3d 245, 246 (4th Cir. 1997). "The federal common law to be applied in § 301 cases is ordinarily the general law of contracts." *Plumbers & Pipefitters Loc. 625 v. Nitro Constr. Servs.*, 27 F.4th 197, 200 (4th Cir. 2022). "Thus, '[the Fourth Circuit] interpret[s] collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law' as long as 'those principles are not inconsistent with federal labor policy.'" *Id.* (quoting *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015)).

The parties agree that the common law elements for a breach of contract claim require the plaintiff to show that: (1) a valid contract existed between the parties; (2) an obligation or duty arose from the contract; (3) the defendant breached that duty; and (4) the breach caused damages. ECF 36, at 15, ECF 38, at 5; *see also White v. Paradise Mgmt., LLC*, Civ. No. JRR-22-01630, 2022 WL 17668762, at *2 (D. Md. Dec. 14, 2022) (noting that under Maryland law, "the elements of a claim for breach of contract include contractual obligation, breach, and damages"); *Bds. of Trs. of Intl. Union of Operating Eng'rs. Loc. 825 Pension Fund v. Long Hill Contractors, Inc.*, Civil Action No. 25-3839 (MAS) (TJB), 2025 WL 3653942, at *5 (D. N.J. Dec. 17, 2025) ("To state a claim for a breach of a collective bargaining agreement, a plaintiff must adequately allege: "(1) the existence of a valid contract; (2) a breach of that contract; and (3) resulting damages.") (citation omitted).[6]

[6] Neither party points to federal common law elements of breach of contract. Allegion cites *Slavin v. Imperial Parking (U.S.), LLC*, Civ. No. PWG-16-2511, 2019 WL 1384214, at *4 (D. Md. Mar. 27, 2019), which sets out the above elements but notes they are based on D.C. law for breach of contract. *See* ECF 36, at 15. The Union does not list formal elements for breach of contract, but notes that Allegion has properly stated "the general standard for a cause of action as to a breach of contract under Section 301 of the LMRA." ECF 38, at 5. Because both parties appear to agree that the central questions are whether the Union breached the contract and whether the alleged breach resulted in damages to Allegion, the Court proceeds with analyzing those two factors. *See also United States v. Tyler Construction Grp., Inc.*, 5:14-CV-778-JG, 2016 WL 5716354, at *4 (E.D.N.C. 2016) ("To establish a claim for breach of contract under federal . . . law,

Allegion pleads that the CBA was "a valid and enforceable contract," ECF 17, at 12 ¶ 66, that the CBA obligated the Union "to act as the bargaining representative for the Union employees through January 31, 2024," *id.* at 5, ¶ 22, that the Union nonetheless breached the CBA by disclaiming its representation of the bargaining unit on February 28, 2023, without advanced notice to Allegion, *id.* at 5–6 ¶¶ 23–24, and that the alleged breach resulted in damages to Allegion in excess of $25,000, *id.* at 12 ¶ 72. The Union does not dispute that the CBA was a valid contract in place at the time it disclaimed the bargaining unit. The core dispute between the parties, rather, is whether the Union's disclaimer constituted a breach, and if so, whether that breach caused damages to Allegion. Though Allegion has pleaded that the disclaimer constituted a breach resulting in damages, the Court only takes the *facts* alleged by Allegion as true, and considers whether the law as applied to those facts would support a breach of contract claim. *See Erickson*, 551 U.S. at 94.

*i. Whether the Union's Disclaimer Constitutes a Breach*

The central question is whether the facts alleged by Allegion regarding the Union's disclaimer of the bargaining unit following the deauthorization vote and prior to January 31, 2024, taken as true, constitute a breach of the CBA.

The Union argues that Allegion has "failed to allege sufficient facts to show that the Union's disclaimer of interest was invalid or in any way acted as a breach of the CBA[.]" ECF 25-1, at 9. Specifically, the Union points to Ninth Circuit and NLRB opinions for the proposition that a union may validly disclaim its interest in a bargaining unit following a deauthorization vote, while arguing that Allegion has pled no facts aligning with cases in which courts have found a

the plaintiff must establish that: (1) a valid contract existed between the parties; (2) the defendant breached the terms of that contract; and (3) the plaintiff was damaged thereby.").

disclaimer to represent a breach of a collective bargaining agreement. *Id.* at 10–11; ECF 38, at 5–14. The Union identifies no relevant Fourth Circuit authority on this point. *See* ECF 17, at 10–11; ECF 38, at 5–14. For its part, Allegion makes no legal argument addressing why the disclaimer constitutes a breach of contract beyond reiterating that "[a]s to the third element, Allegion Access has pled that the Union breached its duty under the CBA by unilaterally terminating the CBA and simply waking away from the bargaining unit." ECF 36, at 16.

In *NLRB v. Circle A & W Prods. Co.*, 647 F.2d 924, 924–25 (9th Cir. 1981), a union "disclaimed representation of a bargaining unit during the existing term of a collective bargaining agreement with the employer," in response to a successful union deauthorization petition. The formerly represented employees then selected a new union as their collective bargaining agent in an election supervised by the NLRB. *Id.* at 924. When the employer "refused to bargain with the new union, claiming a right to stand upon the existing collective bargaining agreement until it expired," the NLRB cited the employer for refusal to bargain and sought enforcement of its order from the court. *Id.* On appeal, the employer effectively challenged the validity of the disclaimer, arguing that employees could designate a new bargaining agent "contrary to the terms of an existing collective bargaining agreement only if representation by the original union is wholly impracticable, such as in cases where there is a union schism, or where the union is defunct." *Id.* at 925 (internal citations omitted). The court disagreed, validating the disclaimer and requiring the employer to bargain with the new union. *Id.* at 926–27. Importantly, the employer had not alleged that the petition for a new election "was a pretext for avoiding the terms of the collective bargaining agreement," nor did it allege collusion between the parties to that end, nor that avoidance of the agreement was a significant motivation for either the union or the employees. *Id.*

at 926–27. Instead, the company alleged that "the dispute over the union security clause was the *sole reason* for changing bargaining agents." *Id.* at 927 (emphasis added).

NLRB precedent also appears to support a union's ability to disclaim interest in a bargaining unit following a deauthorization petition and election. *See Prod. & Maint. Union, Loc. 101*, 329 NLRB No. 29, at *4 (1999) (summarizing NLRB precedent as "mak[ing] clear that a union may disclaim its role as a collective-bargaining representative and may do so even in apparent response to the employees' filing of a deauthorization petition or the loss of a deauthorization election"). As the NLRB stated in *Prod. & Maint. Union*, "[a] union that loses a deauthorization election has no assurance that a sufficient number of employees will make regular payments on a voluntary basis. Thus, when a union says it may disclaim representation if it loses a deauthorization petition, this is a statement based on the objective reality of representation." *Id.*; *see also Am. Sunroof Corp.-West Coast, Inc.*, 243 NLRB No. 172, at *2–3 (1979) (giving a union's disclaimer in response to a deauthorization petition and *before* a deauthorization election "full effect" when there was no evidence of collusion and the disclaiming union took "no action inconsistent with the disclaimer").

Allegion acknowledges in opposition that a disclaimer may be valid upon "a factual finding of good faith and an unequivocal showing of a disclaimer of interest." ECF 36, at 24 (citing *666 Drug, Inc. v. Trs. of 1199 SEIU Health Care Emps. Fund*, 571 Fed. App'x. 51, 53 (2d Cir. 2014)). Even still, Allegion essentially argues, the *Toyota Landscape* court emphasized that "allowing [a union] to walk away from its agreement disrupts industrial stability." 726 F.2d at 529. However, in *Toyota Landscape*, the disclaimer was not due to a deauthorizing petition but was instead a "unilateral" decision made by a union executive, the reason for which was the subject of a factual dispute. *Id.* at 527. Moreover, it appears that under either of the two factual scenarios presented

to explain the disclaimer, the court there held that public policy mandated a finding that a finding of "good faith" could not override significant public policy concerns. *Id.* at 528 ("Good faith is not the correct test. Sound policy reasons counsel against local unions repudiating contractual obligations whether to promote harmony with other unions or to resolve some intra-union political dispute.").

Here, there is no such disagreement: both parties acknowledge that the Union disclaimed its bargaining unit in response to the deauthorization petition. ECF 17, at 4 ¶¶ 15–16 (Allegion's complaint acknowledging "the current dispute began" when dissatisfied bargaining unit employees filed an NLRB petition to deauthorize the Union); ECF 25-1, at 10–11 (Union's motion to dismiss arguing Allegion makes "no allegations that the disclaimer of interest was made for any reason other than in response to the deauthorization election, and Allegion can allege no facts to this effect"). Allegion argues that its pleadings "do not support a good faith disclaimer of interest," ECF 36, at 25, but it does not plead bad faith nor allege that the Union's disclaimer—at the time it was made—was ever equivocal. Allegion frames the Union's attempted retraction of its disclaimer in response to threat of litigation as evidence of bad faith, *id.*, but cites no authority for the proposition that an attempted withdrawal in response to litigation constitutes bad faith—and therefore, cannot overcome its own position in the complaint that the disclaimer was due to the bargaining unit's deauthorization election.

Because a union's disclaimer of its bargaining unit in response to a deauthorization appears to be valid under NLRB and sister circuit precedent, Allegion has not cited any binding authority to the contrary, and the complaint alleges that the Union disclaimed the bargaining unit because of the deauthorization and no other factors, Allegion has not stated a claim for breach of contract.

**B. Indemnification and Attorney's Fees**

Allegion's claim for attorney's fees and indemnification "requests that this Arbitrator issue an order requiring the Union to indemnify Allegion for all withdrawal liability, fees, interest, damages, and attorneys' fees incurred in responding to the March 2025 letter, preparing the Request for Review, initiating this Complaint, and any and all liability assessed against Allegion."[7] ECF 17, at 13 ¶ 78.

The Union moves to dismiss this claim on three grounds: first, that Allegion has not identified any source of the Union's alleged obligation to indemnify Allegion; second, that the claim is premised on a breach of contract that did not occur; and third, that applying indemnification in a withdrawal liability context "would exceed the statutory authority of an arbitrator in deciding a withdrawal liability dispute." ECF 25-1, at 15. Allegion's arguments in support of an independent indemnification claim, in contrast to damages that would flow from a successful breach of contract claim, are sparse. In fact, Allegion does not address its indemnification claim separately. Instead, the two mentions of indemnification in Allegion's response group damages and indemnification together. *See* ECF 36, at 16–17 (stating Allegion "has pled sufficient facts for its claims for breach of contract and attorneys' fees/indemnity"); *id.* at 28 (arguing that "the Union's claim that it somehow is shielded from liability or indemnity . . . is meritless" *because* the Supreme Court and circuit courts "have conclusively ruled that a Union may be held liable for *damages* to an employer for both breach of contract and tort") (emphasis added)). Once again, neither party cites Fourth Circuit authority.

[7] The Union also points out, and the Courts notes, that it "is unclear as to the basis of Allegion's pleadings, as the underlying claim for indemnification makes a request to an arbitrator, which is not present in this case." ECF 25-1, at 15.

The cases Allegion cites for its indemnification claim support damages for intentional tort and § 301 breach of contract claims against a union, but they provide no such support for an independent indemnification claim. *See* ECF 36, at 17–18, 28. For example, in *Glacier Northwest, Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, the Supreme Court reversed dismissal of a company's intentional tort claim for damages against a union, holding that the company's claims were not preempted by the NLRA and that the case could proceed. 598 U.S. 771, 781–82 (2023). *Glacier Northwest* did not involve an indemnification claim nor even a § 301 claim, but rather an intentional tort, and therefore does not offer much insight here. *Id.* In *Contempo Design, Inc. v. Chicago & N.E. Ill. Dist. Council of Carpenters*, the Seventh Circuit confirmed that damages are available in § 301 claims, noting that "[i]f one party breaches a collective bargaining agreement, the injured party may recover damages." 226 F.3d 535, 553 (7th Cir. 2000) (citing *Drake Bakeries, Inc. v. Loc. 50, Am. Bakery & Confectionary Workers Int'l*, 370 U.S. 254, 266 (1962)) (in § 301 claim for break of contractual no-strike provision). *Contempo Design*, however, makes no mention of indemnification, instead it merely confirms the availability of damages in § 301 claims. *See id.*

Importantly, the CBA itself contains no indemnification clause. In *Nitterhouse Concrete Prds. v. Glass, Molders, Pottery, Plastics & Allied Workers Int'l Union*, the Third Circuit implied that a union could be required to indemnify a company that was assessed withdrawal liability following the union's termination of a collective bargaining agreement. 763 Fed. App'x. 164, 166–67 (3d. Cir. 2019). There, the court ultimately held that the union did not need to indemnify the company because the indemnification clause expired with the termination of the agreement, which preceded the assessment of withdrawal liability. *Id.* at 167. However, Allegion's claim has a more fundamental problem: the CBA contains no indemnification clause in the first place, ECF 25-1, at 16, and Allegion has not made any argument for implied indemnification. *See, e.g. Utility*

*Line Srvs. Inc. v. Washington Gas Light Co.*, Civ No. PWG-12-3438, 2013 WL 3465211, at *5 (D. Md. July 9, 2013) (citing *Pulte Home Corp. v. Parex, Inc.* 942 A.2d 722, 730 (Md. 2008)) (noting possibility of "indemnity by implication" arising from special relationship between parties).

Ultimately, even assuming Allegion had adequately pled a breach of contract claim, its own cited cases make clear that the appropriate avenue for redress is through damages for breach of contract—not through a non-existent indemnification clause. Count II is therefore dismissed.

**C. Unjust Enrichment**

Allegion's third count against the Union is for unjust enrichment. ECF 17, at 13–14 ¶¶ 79–85. As an initial matter, the parties appear to disagree over whether Connecticut or Maryland law should apply. *See* ECF 38, at 14. However, as the Union acknowledges, the elements of Maryland law "are substantially similar to the Connecticut standard," *id.*, requiring (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance of retention by the defendant under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value. *See Horner v. Bagnell*, 154 A.3d 975, 983 (Conn. 2017); *see also Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007).

Allegion argues that it "conferred a benefit upon the Union by paying [CBA-mandated contributions] into the Plan," that the "Union appreciated and/or had knowledge of this benefit," and that by breaching the CBA, "the Union retained the benefit of Allegion's payments into the [Pension Fund] Plan while simultaneously damaging Allegion in excess of 1,900,000.00." ECF 17, at 13 ¶¶ 80–82. The Union responds that "Allegion's pleadings are at best bare assertions of the elements of an unjust enrichment claim," as Allegion has "made no pleadings as to how the Union directly benefitted from payments to the Pension Fund, a distinct legal entity." ECF 38, at

14. Further, the Union argues, because the payments went to the Fund on behalf of Allegion employees, "it is no more true that the Union benefitted from certain members receiving a pension benefit than that Allegion benefitted from certain employees receiving a pension benefit." *Id.* On that note, the Union argues that the benefit of Plan contributions "is intended for the benefit of Allegion's employees in exchange for the labor they provided, which benefitted Allegion." ECF 25-1, at 17. Finally, the Union argues, Allegion has not made "any pleadings as to why such benefit contributions, allegedly made to the benefit of the Union, are now inequitable when kept by the Pension Fund." ECF 38, at 14.

Neither party cites case law in support of these arguments. However, it appears that the Union is correct that Allegion does not provide more than the bare assertion that "Allegion conferred a benefit upon the Union by paying . . . into the Plan." ECF 17, at 13 ¶ 81. Because Allegion's complaint merely recites conclusory allegations regarding benefit conferred, benefit retained, and inequity of retention, Allegion has failed to state a claim for relief for unjust enrichment.

Further, Allegion's complaint directly links the unjust retention element to the Union's alleged breach of the CBA. *See id.* ¶ 82 ("Despite this benefit, the Union breached the CBA. *In so doing*, the Union retained the benefit of Allegion's payments into the Plan while simultaneously damaging Allegion in excess of $1,900,00.00." (emphasis added)). Because the Court has found that Allegion has not pleaded sufficient facts to state a claim for breach of contract, and the face of Allegion's complaint premises its unjust enrichment claim on the Union's alleged breach, Allegion has not stated a claim for relief under unjust enrichment. Consequently, it is unnecessary to reach the parties' arguments regarding whether the equitable remedy of unjust enrichment is available in this case in the first place. *See* ECF 38, at 14–15.

## IV. CONCLUSION

For the foregoing reasons, the Union's motion to dismiss, ECF 25, is **GRANTED**. A separate implementing order will issue.

Dated: September 16, 2026

/s/
Brendan A. Hurson
United States District Judge