**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND AND DANIEL WILLIAMS, | * | |
| Plaintiffs, | * | |
| v. | * | Civil No. 25-02624-BAH |
| ALLEGION ACCESS TECHNOLOGIES, LLC, | * | |
| Defendant/Third-Party Plaintiff, | * | |
| v. | * | |
| GLAZIERS AND STRUCTURAL GLASS WORKERS LOCAL UNION 1333, DISTRICT COUNCIL 11, | * | |
| Third-Party Defendant | * | |

* * * * * * * * * * * * * *

## **MEMORANDUM OPINION**

The International Painters and Allied Trades Industry Pension Fund and its fiduciary Daniel Williams brought suit against Allegion Access Technologies, LLC ("Allegion") on August 8, 2025, alleging failure to comply with the Employee Retirement Income Security Act of 1974 ("ERISA") as amended by the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"). ECF 1. Allegion then filed a third-party complaint against Glaziers and Structural Glass Workers Local Union 1333, District Council 11 ("the Union") pursuant to Federal Rules of Civil Procedure 14 and 19. ECF 17. Pending before the Court are the Fund's motion for summary judgment, ECF 39, and Allegion's cross-motion for summary judgment, ECF 42. Along with its cross motion, Allegion filed an opposition, ECF 42, the Fund filed a consolidated opposition and

reply brief, ECF 45, and Allegion filed a reply, ECF 46. All filings include memoranda of law.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, the Fund's motion for summary judgment is **GRANTED** and Allegion's cross motion for summary judgment is **DENIED**.

# I. BACKGROUND

## A. Factual Background[2]

### 1. Origins of the Relationship Between the Parties

The Fund is a multiemployer employee benefit pension plan within the meaning of the MPPAA. ECF 16, at 2 ¶ 5. The Fund is administered by a Board of Trustees composed of an equal number of employer and union representatives, and is maintained for the purpose of providing retirement and related benefits to eligible participants and beneficiaries. *Id.* ¶ 6. Daniel R. Williams is a fiduciary of the Fund and initiated this action on the Fund's behalf in his official capacity.[3] *Id.* ¶ 7. Allegion is a contributing employer to the Fund, ECF 1-2, at 3, and until approximately February 28, 2023, was contributing to the Fund on behalf of bargaining unit employees who were represented by the Union at the time. ECF 42-1, at 381.

On July 31, 2021, Stanley Black & Decker ("Stanley") and the Union executed a collective bargaining agreement ("CBA"). ECF 1-2, at 25. On July 5, 2022, Allegion acquired Stanley Access Technologies, LLC ("Access Technologies") from Stanley and stepped into the shoes of

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[2] The facts provided in this section are taken from the parties' summary judgment motion filings, ECF 39, ECF 42, ECF 45, ECF 46, and Allegion's answer, ECF 16, with reference to the Fund's complaint, ECF 1. Because both parties have moved for summary judgment, where a fact is in dispute, the Court notes how it could be construed in the non-moving party's favor.

[3] The Court refers to plaintiffs collectively as "the Fund."

Stanley and Access Technologies on the CBA and on over fifteen other collective bargaining agreements. ECF 1-2, at 3. At least eight of the collective bargaining agreements Allegion stepped into after acquiring Access Technologies required pension benefit contributions to the Fund on behalf of bargaining unit employees. *Id.*

2. <u>The CBA</u>

The CBA was effective from February 1, 2021, through January 31, 2024. ECF 42-1, at 231. Section 18.1 of the CBA provides that the CBA automatically extends each year unless the employer or the Union provides "written notice to the other at least sixty (60) days prior to the expiration date or any yearly anniversary thereafter that they desire to modify or terminate the Agreement." *Id.* at 244. Section 9.1 of the CBA requires disputes between the parties to be submitted to a grievance and arbitration procedure and prohibits strikes and lockouts. *Id.* at 239. Section 2.7 of the CBA includes a checkoff authorization form (the "Authorization Form") that all bargaining units were required to execute. *Id.* at 233. The form authorizes paycheck deductions to be paid to the Union, effective February 1, 2021, and states that the authorization is "irrevocable for the term of one year and shall automatically renew itself for successive yearly periods thereafter, until [the employee] give[s] written notice to the Company and the Union at least sixty (60) days . . . before any periodic renewal date of this authorization and assignment of [the employee's] desire to revoke the same." *Id.*

3. <u>Deauthorizing the Union and the Union's Disclaimer of Representation</u>

At some point prior to February 22, 2023, a bargaining unit employee filed a petition (the "Petition") with the National Labor Relations Board ("NLRB"), Case No. 01-US-309536, seeking to withdraw the Union's authority to require bargaining unit employees to make payments to the Union pursuant to the CBA. ECF 42-1, at 247. The bargaining unit voted in favor of the Petition

and the NLRB certified the election results on February 22, 2023. *Id.* Following the deauthorization vote, Allegion reached out to the Union to discuss the Authorization Form and its impact on bargaining unit employees. *Id.* The Union confirmed on March 6, 2023, that the Authorization Form signed by the bargaining unit employees could not be immediately revoked. *Id.*

On February 28, 2023, following the deauthorization vote, the Union advised the bargaining unit that it "disclaim[ed] all interest in representing the twenty-one (21) member collective bargaining unit." ECF 42-1, at 345. On March 14, 2023, Allegion sent a letter to the Union in response to its disclaimer of interest stating its position that the Union's disclaimer was unlawful, that it interfered with Allegion's ability to contribute to the pension plan, that it may result in Allegion's withdrawal liability, and that Allegion would file a lawsuit if such liability resulted. *Id.* at 347–54. In response, the Union clarified through an April 13, 2023, letter that it would "continue to represent the Bargaining Unit members pursuant to the existing [CBA]." *Id.* at 255. Allegion responded in letters dated April 11, 2023, *id.* at 257, and May 15, 2023, *id.* at 261, stating that the Union's material breach of the CBA resulted in the CBA's termination and that the Union could not resume its obligations thereunder. Then, on November 9, 2023, the Union submitted to Allegion its notice of intent to terminate the CBA at the conclusion of the term, *id.* at 265, to which Allegion responded on November 15, 2023, by reiterating its position that the Union had already terminated the CBA by materially breaching the agreement in February 2023, *id.* at 267.

4. <u>Allegion's Plan Contribution Obligations and Governing Standards</u>

Paragraph 14.6 of the CBA requires Allegion to make payments to the Fund's pension plan for all hours worked by the bargaining unit. ECF 42-1, at 242. Article 11 of the International and

Allied Trades Industry Pension Plan agreement (the "Plan") addresses employer withdrawals from the Plan. *Id.* at 115. Section 11.01(b) of the Plan verifies that the Section 11's rules "generally" apply to construction industry employers, whereas withdrawals by non-construction industry employers are governed by ERISA provisions 4203, 4205, 4208, and 4219, rather than Article 11. *Id.* at 115–16. Under Section 11.03 of the Plan, a control group employer is in the construction industry "if substantially all the Employees with respect to whom the Control Group Employer has an obligation to contribute under the Plan perform work in the building and construction industry." *Id.* at 117. Section 11.05 of the Plan addresses partial withdrawals for construction industry employers and provides that a partial withdrawal for construction industry employers occurs "only if, on the last day of a Plan Year, the Control Group Employer's work mix, within the craft and area jurisdiction of a Collective Bargaining Agreement under which it is obligated to contribute to the Plan, shifts, with the result that no more than an insubstantial portion of such work remains covered under the Plan." *Id.* at 118.

Though Stanley, the original signatory to the CBA, was a tool manufacturer, Allegion's sole focus as a company is on state-of-the-art slide doors for industrial, commercial, healthcare, and retail use. ECF 1-2, at 3–4. During the events in question in this action, Allegion employed 180 employees involved in the manufacturing of sliding doors and 545 technicians who installed the sliding doors. ECF 1-2, at 4. Section 1.1 of the CBA defines the bargaining unit as "all [of] the Company's automatic door operated equipment installers, servicemen, maintenance repairmen, shopmen and working foreman employed by [Allegion] at its New Britain, Connecticut office." ECF 42-1, at 232.

5. Allegion's Alleged Withdrawal Liability and Response

On March 10, 2025, the Fund sent a letter to Allegion assessing estimated partial withdrawal liability of $1,917,896 for the year 2023 (the "Assessment"). *See* ECF 1-1. The Fund based its assessment of Allegion's partial withdrawal from the Fund on Section 4205(a)(2) of ERISA, 29 U.S.C. § 1385(a)(2), and alternatively, Section 4208(d)(1) of ERISA, 29 U.S.C. § 1388(d)(1). *Id.* at 1. The Assessment demanded payment of the assessed liability and notified Allegion that it must pay the withdrawal liability through lump sum payment or through fourteen monthly payments of $129,709 each, with the first payment due by May 12, 2025. *Id.*

On June 6, 2025, Allegion responded to the Fund timely requesting review of the Assessment and invoking the applicable statutory exhaustion procedures of requesting review pursuant to 29 U.S.C. 1399(b)(2)(A) and § 11.26 of the Plan. *See* ECF 1-2. The Fund replied to Allegion's request for review on August 8, 2025, denying the request in its entirety. *See* ECF 1-3. Allegion has not made any of the payments under the Assessment according to the Fund's proposed schedule of payments. ECF 39-3, at 2 ¶¶ 5–7; ECF 16, at 5 ¶¶ 30–33.

On August 8, 2025, the Fund filed suit against Allegion under ERISA as amended by the MPPAA. ECF 1. On October 2, 2025, Allegion filed a demand for arbitration against both the Fund and the Union. ECF 42-1, at 12 ¶ 71. The arbitration commenced and was still pending as of the filing of the parties' summary judgment cross-motions. *Id.* at 13 ¶ 73.

## B. Procedural History

The Fund filed suit against Allegion on August 8, 2025, seeking to compel compliance with the MPPAA's "pay now, dispute later" provision as the Fund's withdrawal liability assessment proceeded through dispute-resolution and arbitration channels. ECF 1. Defendant Allegion answered on October 7, 2025, and filed an answer and counterclaim against the Fund.

ECF 16. The Fund moved to dismiss Allegion's counterclaim on October 28, 2025, ECF 19. Allegion's response in opposition was due November 12, 2025, but Allegion filed an opposed motion on January 2, 2026, for extension of time, citing internal confusion and clerical errors that led to Allegion missing the response deadline. ECF 29. However, on January 7, 2026, the parties filed a stipulation dismissing the counterclaim without prejudice and reserving the Fund's right to move for summary judgment under Federal Rule of Civil Procedure 56. ECF 34. The Court approved the stipulation on January 7, 2026. ECF 35.

The same day that Allegion filed its answer and counterclaim, Allegion also filed a third-party complaint against the Union, bringing three counts for breach of contract, attorneys' fees and indemnification, and unjust enrichment. ECF 17. The Court has ruled on that motion separately. *See* ECF 50.

On February 13, 2026, the Fund moved for summary judgment. ECF 39. On March 13, 2026, Allegion responded in opposition and cross-moved for summary judgment. ECF 42. The Fund replied to Allegion's opposition and responded in opposition to Allegion's cross motion on April 17, 2026. ECF 45. Finally, Allegion replied to the Fund's opposition on May 4, 2026. ECF 46. It is the cross motions for summary judgment that are now pending before the Court.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 372 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials,

without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 372 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted). In so doing, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (citations omitted).

## III. <u>ANALYSIS</u>

Three questions guide the Court's analysis. First, is Allegion subject to liability under the MPPAA's "pay now, dispute later" regime? Second, do any equitable or statutory exceptions to Allegion's alleged withdrawal liability apply? And finally, if Allegion is liable, what is the scope of its liability? After providing some background on ERISA and the MPPAA, the Court considers each question in turn.

### A. Background: ERISA and MPPAA

A multiemployer pension plan is a single pension plan to which multiple employers contribute on behalf of their union employees pursuant to collective bargaining agreements. 29 U.S.C. § 1301(a)(3). Such plans are administered by separate legal entities that are jointly administered by an equal number of trustees representing the union and trustees representing employers. 29 U.S.C. § 186(c)(5)(B); *see also Krueger v. Angelos*, 26 F.4th 212, 214 (4th Cir. 2022) (noting that the Labor Management Relations Act ("LMRA") requires that an equal number of trustees represent the union and the employers).

Congress enacted ERISA in 1974 to "assure private-sector workers that they would receive the pensions that their employers had promised them." *Milwaukee Brewery Workers' Pension*

*Plan v. Joseph Schiltz Brewing Co.*, 513 U.S. 414, 416 (1995) (reviewing ERISA's requirement that employers "make contributions that would produce pension plan assets sufficient to meet future vested pension liabilities" among other provisions). However, in its original form, "ERISA did not adequately protect multiemployer pension plans from the adverse consequences of individual employers terminating their participation in such plans and leaving behind unfunded vested benefits." *Bd. of Trs., Sheet Metal Workers' Nat. Pension Fund v. BES Servs., Inc.*, 469 F.3d 369, 374 (4th Cir. 2006). The resulting "scheme encouraged an employer to withdraw from a financially shaky plan and risk paying its share if the plan later became insolvent, rather than to remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417. Given the incentive for employers to withdraw and lack of protections against such withdrawals, "a plan's financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise." *Id.*

In response, Congress passed MPPAA in 1980 to address ERISA's shortcomings. MPPAA "transformed what was only a risk (that a withdrawing employer would have to pay a fair share of underfunding) into a certainty" by "impos[ing] a withdrawal charge on all employers withdrawing from an underfunded plan (whether or not the plan later became insolvent)." *Id.* "In brief, [the MPPAA] sets the total amount of withdrawal liability at a level that roughly matches the employer's proportionate share of the plan's unfunded benefits." *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of California, Inc.*, 522 U.S. 192, 197 (1997) (internal quotations omitted); *see also Int'l Painters & Allied Trades Indus. Pension Fund v. Lettermen Signage, Inc.*, Civ. No. JKB-23-1059, 2024 WL 2882178, at *2 (D. Md. June 7, 2024) (defining withdrawal liability as an employer's "share of a plan's unfunded and vested benefits"). As described below, MPPAA "set[s] forth a detailed set of rules for determining, and collecting, that

charge." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417. It is the applicability of these rules that is at the heart of the dispute between the parties.

**B. Allegion's Withdrawal Liability Under the MPPAA**

The MPPAA "contains detailed dispute resolution provisions." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 118 n.4 (4th Cir. 1991). The Fourth Circuit has explained this process in detail:

> Once the plan sponsors determine that an employer has completely or partially withdrawn from a pension plan, they must notify the employer of the amount of the liability, prepare a schedule for liability payments, and demand payment in accordance with the schedule. 29 U.S.C.A. §§ 1382, 1399(b)(1) (1985). Within 90 days after receiving notice, the employer may ask the plan sponsors to review any specific matter relating to the determination of liability and the schedule of payments. *Id.* at § 1399(b)(2)(A). After reasonable review of any matter raised, the plan sponsors must then notify the employer of their decision. *Id.* at § 1399(b)(2)(B). If either party disputes the outcome, Section 1401(a)(1) requires that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." After arbitration proceedings are completed, any party may within 30 days bring an action in federal district court to enforce, vacate, or modify the arbitrator's award. *Id.* at § 1401(b)(2). *Interim payments of withdrawal liability must be made to the plan during the pendency of any dispute. Id.* at §§ 1399(c)(2), 1401(d).

*Id.* (emphasis added). As the Fourth Circuit notes, employers must make interim payments of withdrawal liability to the plan even if the employer disputes the liability assessment. *Id.* Indeed, the MPPAA's "statutory scheme unambiguously established a 'pay now, dispute later' dispute resolution procedure designed to protect the financial stability of multi-employer pension plans from unnecessary risk caused by protracted delay in the collection of withdrawal liability payments." *Teamsters 83*, 947 F.2d at 119. "Even if the employer challenges the trustees' withdrawal liability determination, . . . it still must pay according to the trustees' schedule in the interim under the statute's 'pay now, dispute later' collection procedure." *Bay Area Laundry*, 522 U.S. at 197 (internal citations omitted).

Two MPPAA provisions establish the "pay now, dispute later" procedure. First, 29 U.S.C. § 1399(c)(2) applies to the pre-arbitration dispute process and requires employers to begin making payments to the plan upon an assessment of liability regardless of whether the employer challenges the assessment:

> Withdrawal liability *shall* be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) beginning no later than 60 days after the date of the demand *notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.*

(emphasis added); *see also* 29 U.S.C. § 1401(b)(1) (providing that if no arbitration proceeding is initiated regarding a withdrawal liability assessment, "the amounts demanded by the plan sponsor under section 1399(b)(1) of this title shall be due and owing on the schedule set forth by the plan sponsor" and permitting the plan sponsor to bring an action to collect). Second, if arbitration is pending, 29 U.S.C. § 1401(d) similarly requires an employer to make interim payments during the arbitration:

> Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination. If the employer fails to make timely payment in accordance with such final decision, the employer shall be treated as being delinquent in the making of a contribution required under the plan.

In other words, whether arbitration is pending or not, the MPPAA requires an employer to make interim withdrawal liability payments, regardless of the potential merit of an employer's dispute of an assessment. *See id.*; *see also* 29 U.S.C. § 1399(c)(2); *Teamsters 83*, 947 F.2d at 119; *Bay Area Laundry*, 522 U.S. at 197.

To trigger an employer's duty to make interim payments, the plan sponsor must notify the employer of the amount of liability and the schedule for payments and demand payment in accordance with the schedule. 29 U.S.C. 1399(b); *see also Int'l Painters and Allied Trades Indus.*

*Pension Fund v. Fla. Glass of Tampa Bay, Inc.*, 165 F.4th 846, 855 (4th Cir. 2026) (explaining the MPPAA's requirements that a fund "must clearly 'notify the employer' of withdrawal liability, 'demand payment,' and be submitted '[a]s soon as practicable after' the employer's withdrawal") (brackets in original) (citing 29 U.S.C. § 1399(b)(1)); *Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 141 (3d Cir. 1997) (explaining that "all [§ 1399(b)] requires" is "showing that withdrawal liability was assessed, [the employer] was notified and payments were not made").

Allegion does not appear to dispute that it is subject to the MPPAA's "pay now, dispute later" provision under the three factors laid out above: that withdrawal liability was assessed, the employer was notified, and payments were not made. *See generally* ECF 42, at 20–39 (arguing against liability only under purported equitable and statutory exceptions to the "pay now, dispute later" provision). Indeed, the undisputed record supports Allegion's liability under these three factors. First, the Fund sent a letter to Allegion on March 10, 2025, assessing estimated partial withdrawal liability of $1,917,896. ECF 1-1. Second, there is no doubt that Allegion received the Assessment Letter. *See* ECF 1-2, at 1 (Allegion's response to the Assessment Letter). Third, Allegion does not dispute that it has not made any interim payments in response to the Assessment Letter. *See* ECF 39-3, at 2 ¶¶ 5–7 (declaration of Michael O'Malley, Audit and Collections Director for the Fund, stating that Allegion has not made any of the assessed interim payments); ECF 16, at 5 ¶¶ 30–33 (Allegion's answer admitting that it has not provided payment pursuant to the Fund's proposed schedule of payments while disputing liability for failure to pay). On the undisputed record, then, Allegion is liable under the MPPAA for its failure to make payments according to the Fund's proposed schedule as laid out in the Assessment Letter unless an exception to its duty to make interim payments exists and applies—a question to which the next section turns.

### C. Exceptions to the "Pay Now, Dispute Later" Provision

Allegion argues that several exceptions to the MPPAA's "pay now, dispute later" provision exist and apply. First, Allegion asserts that the Fourth Circuit has carved out an exception to the requirement of interim payments when an employer shows they will suffer irreparable injury if compelled to make interim payments and that the claim for withdrawal liability is frivolous. ECF 42, at 20. Second, Allegion points to 29 U.S.C. § 1401(e), which purportedly suspends Allegion's obligation to make payments to the plan while the arbitration is pending. *Id.* at 37. Finally, Allegion maintains that "general equities" and Allegion's innocence in halting contributions to the Fund given the Union's breach of its collective bargaining agreement favor either allowing Allegion not to make the payments or requiring the Union to make the interim payments or indemnify Allegion for all interim payments. *Id.* at 32–37. The Court considers each potential exception below.

#### 1. Equitable Exception to MPPAA's Pay Now, Dispute Later Provision

The bulk of Allegion's argument hinges on the applicability of an equitable exception to its duty to make interim withdrawal liability payments. *See* ECF 42, at 20–31.[4] In *Teamsters 83*, the Fourth Circuit noted that "[g]enerally, courts have allowed an exception to the statutory directive [of interim payments] only where an employer makes a facial constitutional attack or

[4] Allegion's primary argument in favor of an equitable exception rests on its claim that it "is not subject to the withdrawal liability at issue in this lawsuit or the pending [a]ribitration" due to the fact that "substantially all the employees with respect to whom [it] has an obligation to contribute under the plan perform work in the building and construction industry." ECF 42, at 21 (citing 29 U.S.C. § 1383(b)(1)(A)). Allegion also alleges that the Fund's claim is frivolous since the "partial withdrawal liability has been imposed for 2023 – the year that Allegion [] had a labor dispute with the Union that caused the contributions to the fund to be suspended." *Id.* at 28. As noted, *infra*, the Court need not assess these arguments further because it finds that even if the equitable exception Allegion argues for is cognizable in the Fourth Circuit, Allegion has failed to establish the requisite irreparable harm required for it to apply.

shows that irreparable injury will result from being forced to make the interim payments." 947 F.2d at 120. Circuits that have applied this exception do so as a two-part test: "(1) has the employer made an affirmative showing that the pension fund lacks a colorable claim, and (2) would the employer suffer irreparable harm if compelled to make interim payments." *Bd. of Trs., Sheet Metal Workers' Nat. Pension Fund v. Courtad Const. Sys., Inc.*, 439 F. Supp. 2d 574, 581 (E.D. Va. 2006) (citing *Trs. of the Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Rentar Indus., Inc.*, 951 F2d 152, 155 (7th Cir. 1991)). However, "it is clear that even in circuits that recognize the equitable exception rule, the employer must satisfy a very high standard to trigger the exception." *Id.* at 582; *see also Teamsters 83*, 947 F.2d at 120 (noting the "burden of qualifying for this exception . . . is extremely high, for the MPPAA provides adequate safeguards to ensure that an employer will promptly recover any overpayment in the lump sum with interest").

Allegion overstates the extent to which the Fourth Circuit has adopted this equitable exception. *See* ECF 42, at 20–21. Indeed, though recognizing that some circuits have done so, the *Teamsters 83* court never actually adopted the equitable exception to the statutory requirement of interim payments. 947 F.2d at 120. Instead, the Fourth Circuit simply noted that while some courts have adopted the exception, the defendant had made no assertion of irreparable injury in the first place. *Id.* Further, Allegion has not identified any cases in this district or circuit that have found the equitable exception to apply, and both of the in-circuit cases Allegion cites in support of the exception appear to, at least in part, undermine it. First, the court in *Courtad Const. Sys.* remarked that the equitable exception described in *Teamsters 83* "is *dicta* because this Fourth Circuit panel never adopted the equitable exception." 439 F. Supp. 2d, at 582 n.13 (emphasis in original). The court further found that, even if the exception applied, the defendant had not met

the "very high standard [required] to trigger the exception . . . with respect to either part of the test." *Id.* at 582. Second, in *Int'l Painters & Allied Trades Inds. Pension Fund v. Fla. Glass of Tampa Bay, Inc.*, Judge Gallagher similarly highlighted that the Fourth Circuit did not adopt or apply the equitable exception in *Teamsters 83* and reiterated that "[o]ther courts have thus characterized [*Teamster 83*'s] discussion of the equitable exception as dicta." Civ No. SAG-23-0045, 2023 WL 3304891, at *6 (D. Md. May 8, 2023) (citing *Findlay Truck Line, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 726 F.3d 738, 752 (6th Cir. 2013); *Courtad Const. Sys.*, 439 F. Supp. 2d at 582 n. 13).

Even if the Court were to seize on the Fourth Circuit's 1991 dicta and apply the equitable exception, however, the undisputed facts taken in a light most favorable to Allegion do not satisfy the test's "very high standard." *See Courtad Cont. Sys.*, 439 F. Supp. 2d. at 582. In courts that do apply the equitable exception, the employer must satisfy both prongs of the test, meaning that if it fails to establish either prong, it cannot establish an equitable defense. *Cf. id.* ("When applying the test, if the employer cannot establish that the plan sponsor's claim is frivolous, a district court should not proceed to the question of irreparable harm." (citing *Debreceni v. Merchants Terminal Corp.*, 889 F.2d 1, 6 (1st Cir. 1989); *Galgay*, 105 F.3d at 141; *Marvin Hayes Lines, Inc. v. Central States, Se. & Sw. Areas Pension Fund*, 814 F.2d 297, 300 (6th Cir. 1987))). Because, as explained below, the undisputed facts do not establish irreparable harm to Allegion, it is unnecessary to dive into the thornier issue of the merits of the Fund's assessment against Allegion.

"Courts recognizing the equitable exception apply a very high standard for finding irreparable harm." *Courtad Const. Sys.*, 439 F. Supp. 2d. at 582. "Only the threat of imminent insolvency is sufficient to demonstrate irreparable harm." *Id.* (citing *Debreceni*, 889 F.2d at 7). In *Teamsters No. 83*, the Fourth Circuit cited two district cases to illustrate the "extremely high"

burden of showing irreparable harm. 947 F.2d at 120. First, in *Connors v. Brady-Cline Coal Co.*, the court held that even the employer's claim that it would cease operations if forced to make interim payments was insufficient given "that under MPPAA 'adequate safeguards exist to insure that . . . [the employer] will promptly recover any overpayment in the lump sum with interest.'" 668 F. Supp. 5, 8 (D.D.C. 1987) (brackets and ellipses in original) (quoting *I.A.M. Nat. Pension Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 25 (D.C. Cir.), *cert. denied*, 479 U.S. 971 (1986)). Granting summary judgment, the court directed the defendants to make interim withdrawal liability payments and noted that "[i]f the arbitrator finds that plaintiffs miscalculated the withdrawal liability, any excess payments plus interest must be refunded immediately to defendants." *Id.* at 8–9. Second, in *Robbins v. Pepsi-Cola Metro. Bottling Co.*, the district court noted that the defendant employer had not claimed that the requirement of interim liability payments would "bankrupt them or leave them on the brink of financial ruin," and that "defendants have failed to demonstrate that Congress' allocation of resources pending disputes over withdrawal liability produces any irreparable injury to the [employer]." 637 F. Supp. 1014, 1020–21 (N.D. Ill. 1986).

Allegion "concedes that it will not become financially insolvent should it be required to make the interim payments." ECF 46, at 10. Instead, Allegion's main argument related to irreparable harm focuses on the Fund's purported financial instability and potential inability to repay Allegion if the arbitrator were to so order.[5] *See* ECF 42, at 29–31; ECF 46, at 10–12.

---

[5] Allegion also puts forward a variety of arguments stylized as, but ultimately irrelevant to, a showing of irreparable harm. These arguments include that Allegion Access is an innocent party, that Allegion did not make the decision to withdraw from the plan of its own accord but was rather forced to by the Union's breach of the CBA, and that Allegion continues to make contribution to the Plan on behalf of other bargaining units. *See* ECF 42, at 29–30. On their face, these arguments do not relate to the irreparable harm inquiry, and Allegion provides no authority to the contrary. *See id.*

However, Allegion provides no authority for the proposition that a pension fund's potential inability to repay an employer according to an arbitrator's order satisfies the irreparable harm prong in the MPPAA context. *See id.* And the two cases Allegion cites to suggest that "questions concerning a party's ability to satisfy a judgment supports a likelihood of irreparable harm" relate to irreparable harm in the context of preliminary injunctions, not the MPPAA. *See* ECF 46, at 10–11 (citing *Viper Publishing, LLC v. Bailey*, No. 3:17-CV-00314-GCM, 2021 WL 956231, at 2 (W.D.N.C. Jan. 12, 2021); *United States ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1331 (4th Cir. 1989)).

Because the undisputed facts taken in the light most favorable to Allegion do not establish irreparable harm in the MPPAA context, Allegion is not eligible for the (already doubtful) equitable exception to the MPPAA's "pay now, dispute later" provision. It is thus unnecessary to proceed to whether, under the undisputed facts, the Fund's claim is frivolous.

2. Statutory Exception to MPPAA's Pay Now, Dispute Later Provision

Allegion also argues that 29 U.S.C. § 1401(e)(2)(B) discharges its responsibility to make interim payments. ECF 42, at 37–38. That provision states in relevant part:

> Notwithstanding subsection (d)[6] and section 1399(c) of this title, if an employer contests the plan sponsor's determination under paragraph (1) through an arbitration proceeding pursuant to subsection (a), or through a claim brought in a court of competent jurisdiction, the employer shall not be obligated to make any withdrawal liability payments until a final decision in the arbitration proceeding, or in court, upholds the plan sponsor's determination.

[6] 29 U.S.C. § 1401(d) provides in full: "Payments shall be made by an employer in accordance with the determinations made under this part until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination. If the employer fails to make timely payment in accordance with such final decision, the employer shall be treated as being delinquent in the making of a contribution required under the plan (within the meaning of section 1145 of this title)."

According to Allegion, this provision "explicitly provides that interim payments are paused pending the outcome of an arbitration challenging withdrawal liability." ECF 42, at 38.

As the Fund points out, Allegion's argument rests on cherry-picked language from the statute in an unsuccessful effort to stretch an extremely narrow statutory exception beyond its clear boundaries. ECF 45, at 14 n. 5. Allegion states that because it "has filed an arbitration challenging with withdrawal liability determination at issue in this lawsuit . . . [it] is entitled to have interim payments paused pending the outcome of the Arbitration." *Id.* But 29 U.S.C. § 1401(e)(2)(B), as quoted by Allegion, specifically notes that such a pause is only triggered if the employer challenges the plan sponsor's determination *under paragraph (1)* of 29 U.S.C. § 1401(e). Paragraph (1) of 29 U.S.C. § 1401(e)(1) provides that the "special rules" in § 1401(e)(2) disclaiming an obligation to make liability payments until a final decision in the arbitration proceedings only apply if the plan sponsor's determination of withdrawal liability:

> is based in whole or in part on a finding by the plan sponsor under section 1392(c) of this title that a principal purpose a transaction that occurred before January 1, 1999, was to evade or avoid withdrawal liability under this subtitle, *and* . . . such transaction occurred at least before the date of the complete or partial withdrawal.

(emphasis added). Nothing in the record nor in any motions indicates that the Fund's determination of withdrawal liability was based on a transaction whose purpose was to avoid or avoid withdrawal liability, much less one that happened before January 1, 1999. Allegion's proposed statutory exception to the MPPAA's "pay now, dispute later" provision is thus easily denied.

3. <u>General Equitable Exception to Allegion's Liability</u>

Finally, Allegion argues that "general equitable principles" both permit the court to excuse interim payments and justify such an excusal here. ECF 42, at 32. In support of its argument, Allegion rehashes its dispute with the Union, detailing the Union's disclaimer of interest in the

bargaining unit and alleged breach of the CBA and arguing that if Allegion is forced to make interim payments, the Court should require the Union to make those payments or indemnify Allegion. *Id.* at 33–37.

Allegion requests sweeping equitable intervention while offering very little to justify it. The only case Allegion cites in support of the court's authority to excuse interim payments, *Chase v. Trs. of W. Conf. of Teamsters Pension Tr. Fund*, affirmed the court's equitable power to order refunds of contributions made by an employer to a multiemployer plan under a mistake of law—not a general equitable authority to suspend interim payments. *See* 753 F.2d 744, 749–50 (9th Cir. 1985). In contrast, at least three circuit courts have "held that judges have no general equitable power to excuse interim payments." *Trs. of Chicago Truck Drivers, Helpers & Warehouse Workers Union v. Cent. Transp., Inc.*, 935 F.2d 115, 119 (7th Cir. 1991) (citing *Debreceni*, 889 F.2d at 6–8; *Marvin Hayes Lines*, 814 F.2d at 300). Even taking the facts regarding the Union's conduct as true, there is simply no law to support a general equitable exception to the MPPAA's "pay now, dispute later" provision.

Ultimately, the undisputed facts taken in the light most favorable to Allegion do not establish any exceptions to the MPPAA's "pay now, dispute later" provision. Consequently, the Court finds that the Fund is entitled to summary judgment and now considers appropriate relief.

**D. Relief Under the MPPAA**

When a court rules in a pension plan's favor, "a court must award the plan: (1) 'the unpaid contributions,' with interest; (2) 'an amount equal to the greater of' interest on the unpaid contributions or liquidated damages in an amount not exceeding twenty percent of the unpaid contributions; and (3) reasonable attorneys' fees and costs." *Lettermen Signage*, 2024 WL

2882178, at *2 (quoting 29 U.S.C. § 1132(g)(2)); *see also Asbestos Workers Loc. 24 Pension Fund v. NLG Insulation, Inc.*, 760 F. Supp. 2d 529, 543 (D. Md. 2010) (citing 29 U.S.C. § 1451(e)).

Mirroring the statutory requirements, under the terms of the Fund's Plan, an employer that fails to make withdrawal liability payments is liable for the delinquent payments, interest on each delinquent payment, liquidated damages calculated as the greater of either a second award of interest or twenty percent of each delinquent payment, and attorneys' fees and costs of collection. ECF 42-1, at 338–39. Under the Plan, interest accrues "at the rate of 4% per annum on each delinquent payment from the date due until the date paid." *Id.*

1. Unpaid Contributions, Interest, and Liquidated Damages

The Fund calculates that as of February 13, 2026, Allegion owes $1,575,979.56 in delinquent payments ($1,297,090), interest ($19,470.56), and liquidated damages ($259,418). ECF 39-2, at 11. Allegion does not contest its liability for the principal, interest, and liquidated damages, nor does it contest the Fund's calculations. *See* ECF 42, at 39 (only disputing the Fund's reasonable attorneys' fees request). Additionally, the Fund notes that "this amount (and each subcategory that comprises it) will need to be updated by the time the Court rules on this motion" and requests that the Court direct the parties to confer as to updated damages shortly after the Court's ruling. The Court will do so.

2. Attorneys' Fees and Costs

The Fund seeks to recover $63,775 in reasonable attorneys' fees through February 12, 2026, ECF 39-2, at 12–15, and $40,806 for the period between February 13, 2026, and April 16, 2026, ECF 45, at 31–32. The Fund also seeks $405 in reasonable expenses through February 12, 2026. ECF 39-2, at 15. Allegion objects to just two components of the Fund's attorneys' fees

request. ECF 42, at 39. The Court considers those objections before analyzing the Fund's request for reasonable attorneys' fees as a whole.

*i. Contested Fees*

First, Allegion argues that the Fund inappropriately seeks fees for its work responding to Allegion's Request for Review and for the arbitration, arguing that the Fund has "has not provided any argument as to how or why it should be able to recover those fees, how they are so 'inextricably intertwined' so as to support the fee award, or how the work performed with respect to the Request for Review—many months before this lawsuit—was somehow 'useful' in this lawsuit." *Id.* This is untrue. In its motion for summary judgment, the Fund argues that its prelitigation work in responding to the Request for Review was "inextricably linked to and useful for this litigation because Allegion raised [the] same merits challenges in its counterclaim [as in the Request for Review], which the Fund then had to address in its motion to dismiss briefing." ECF 39-2, at 14; *see also Int'l Painters & Allied Trades Indus. Pension Fund v. Interiors by Steve, Inc.*, Civ. No. JRR-21-229, 2023 WL 4446572, at *9 (D. Md. July 11, 2023) (citing *United Plant & Prod. Workers Loc. 175 Pension Fund by Kilkenny v. J. Pizzirusso Landscaping Corp.*, No. 20-CV-2527-RJD-CLP, 2022 WL 4139160, at *19 (E.D.N.Y. Aug. 9, 2022), *report and recommendation adopted*, No. 20-cv-2527-RJD-CLP (E.D.N.Y. Aug. 29, 2022)) (distinguishing, in MPPAA context, between recoverable pre-filing fees "incurred in connection with tasks that were ultimately useful for the litigation" and unrecoverable "pre-filing collection and calculation fees incurred in determining . . . withdrawal liability [a]ssessments") (brackets omitted). Because Allegion raised the same arguments—often verbatim—in its Request for Review as it did in its counterclaim, *compare* ECF 42-1, at 374–95 (Request for Review), *with* ECF 16, 9–22 (counterclaim), there is no question that the Fund's work in responding to the Request for Review

was "ultimately useful for litigation." *See Pizzirusso Landscaping Corp.*, 2022 WL 4139160, at *19.

Second, Allegion objects to attorneys' fees covering the Fund's work in preparing an opposition to Allegion's January 2, 2026, motion for extension of time (ECF 29). ECF 42, at 39. Allegion does not make any specific argument beyond arguing that the Fund's request is based upon "an allegation that [Allegion] did not have a 'good faith' basis for requesting the extension" and stating that "this issue has not been briefed, is flatly incorrect, and the request for fees must be denied." *Id.* However, the record shows that in its motion for extension of time filed on January 2, 2026, Allegion argued that it had "good faith arguments" in response to the Fund's motion to dismiss Allegion's counterclaim. ECF 29, at 5 ¶ 32. This Court directed the Fund to file any opposition to the motion for extension of time by January 7, 2026. ECF 31. Then, on January 7, 2026, the same day the Fund's response was due, Allegion informed the Fund via email that it planned to file a dismissal without prejudice of the counterclaim. ECF 39-4, at 11. Because Allegion provided notice that it would dismiss the counterclaim on the same day the Fund's opposition was due, Allegion is incorrect that the Fund should not be compensated for its expenditures in preparing its opposition. *See City of Riverside v. Rivera*, 477 U.S. 561, 581 n.11 (1986) ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.").

*ii. Uncontested Fees*

For the remaining fees, "[b]ecause [Allegion] has not specifically challenged any requested fee entries and [the Fund] has provided detailed records specifying the services performed, no reduction in attorneys' fees is necessary." *Argonaut Ins. Co. v. Wolverine Constr., Inc.*, 976 F. Supp. 2d 646, 657 (D. Md. 2013). Even still, the proposed fees independently satisfy the standards

for determining whether attorneys' fees are reasonable. To make such a determination, "the court starts with the 'lodestar' figure, which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *CoStar Grp., Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 787 (D. Md. 2000) (citations omitted). The Court "appl[ies] the *Johnson/Barber* factors when making its lodestar determination." *Grissom v. Mills Corp.*, 549 F.3d 313, 320–21 (4th Cir. 2008) (citing *Barber v. Kimbrell's*, Inc., 577 F.2d 216, 226 (4th Cir. 1978)). "An hourly rate is reasonable if it is 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Duprey v. Scotts Co. LLC*, 30 F. Supp. 3d 404, 412 (D. Md. 2014) (quoting *Blum v. Stenson*, 465 U.S. 886, 890 n.11 (1984)). The rates outlined in Appendix B to this Court's Local Rules provide that a slightly modified Fitzpatrick Matrix may be a useful guideline for determining reasonable hourly rates.[7] *See De Paredes v. Zen Nails Studio LLC*, 134 F.4th 750, 753–54 (4th Cir. 2025) (providing that "fee matrices can be 'a useful starting point to determine fees'" but that a court "may not elevate a matrix above all other types of evidence or treat a matrix as establishing a presumptive answer" (quoting *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009)). Other "[e]vidence of the prevailing market rate usually takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate." *CoStar Grp., Inc.*, 106 F. Supp. 2d at 788.

The Fund filed a declaration from Attorney Neil Gregorio of Tucker Arsenberg, P.C., describing the qualifications of the Fund's legal team that worked on this matter and detailing the hourly rates for each team member. ECF 39-5, at 3–5 ¶¶ 10–17. The filing further includes a detailed breakdown of the work provided by each team member. ECF 35-5, at 9–31. Under *Plyer v. Evatt*, "the fee applicant must produce satisfactory specific evidence of the prevailing market

[7] The Fitzpatrick Matrix is available at https://perma.cc/T6FC-G4CC.

rates in the relevant community for the type of work for which he seeks an award." 902 F.2d 273, 277 (4th Cir. 1990) (internal citations omitted). The Fund has done so. *See* ECF 39-5, at 7 ¶ 24. As Attorney Gregorio describes, the proposed rates are well below those described in the Fitpatrick Matrix, which this District considers "a useful guideline for hourly rates . . . with a reduction of 5% to 20%" to reflect differences between legal markets in Washington, D.C., and Maryland. *See* Loc. R. App'x B (D. Md. 2025); *see also* ECF 35-5, at 7 ¶ 24. Additionally, the Fund has also paid all fees for which it had been invoiced as of the filing of the declaration, *id.* at 6 ¶ 21, which is further evidence of reasonableness. *See Robinson v. Equifax Info. Svs., LLC*, 560 F.3d 235, 244 (4th Cir. 2009) (noting that evidence of market rate can include "evidence of what the plaintiff's attorney actually charged his client" (quoting *Depaoli v. Vacation Sales Assocs., LLC*, 489 F.3d 615, 622 (4th Cir. 2007))). Finally, as Attorney Gregorio attests, the proposed rates "are reasonable in this District, as reflected by the many cases in this District approving them." ECF 39-5, at 7 ¶ 24 (citing *Int'l Painters of Allied Trades Indus. Pension Fund v. Fla. Glass of Tampa Bay, Inc.*, Civ. No. SAG-23-00045, 2025 WL 712965, at *3 (D. Md. Mar. 5, 2025), *aff'd* 165 F.4th 846 (4th Cir. 2026)).

Because Allegion has not contested the majority of the Fund's proposed fees, those fees are reasonable under this Court's standards, and because the Fund is entitled to the contested fees as a matter of law, the Court awards the Fund reasonable attorneys' fees and costs totaling $104,986.

## IV. CONCLUSION

For the foregoing reasons, the Fund's motion for summary judgment is **GRANTED** and Allegion's cross motion for summary judgment is **DENIED**.

A separate implementing order will issue.

Dated: September 22, 2026

/s/
Brendan A. Hurson
United States District Judge